UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE RUSSELL,

              Plaintiff,

                                         Case No. 16-14135
v.                                      Honorable David M. Lawson

STATE OF MICHIGAN DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
RENEE ADJORAN, RYAN CLEMONS,
CANDACE BAKER, and SUSAN COOK,

              Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
## SUMMARY JUDGMENT AND DISMISSING CASE WITH PREJUDICE

Plaintiff Catherine Russell, an African-American female, filed this action alleging that she was denied a promotion by the Michigan Department of Health and Human Services (DHHS) because of unlawful discrimination based on her race, sex, and age. DHHS and its employee defendants contend that she was not selected from among the five finalists because of her low interview score. They say in their motion for summary judgment that the evidence presented so far shows that a reasonable jury could not find that the defendants' legitimate non-discriminatory reason for not promoting the plaintiff was pretextual. The Court agrees. The motion will be granted and the case dismissed.

I.

Russell is a current employee of DHHS. She began working there in 1990, serving as a youth specialist at the Maxey Boys Training School. As a result of budget-related downsizing, Russell transferred to the Washtenaw County DHHS in 2008. She initially served as an Assistance

Payments Worker, level 10 (APW 10). APWs determine applicants' eligibility for financial assistance programs and maintain ongoing cases.

In 2011, Russell applied and interviewed for the position of Lead APW, level 11 (Lead APW 11). Of the four classifications of APWs, level 11 is the highest. Employees functioning as "lead" workers at this level are responsible for overseeing the work assignments of other APWs, and training new employees while performing regular APW assignments considered to be of significantly greater complexity than those assigned to APW 10s. Russell was interviewed by a three-person panel of APW supervisors and family independent managers, who asked her several situational questions. She was promoted to the position for a limited term on October 1, 2011 and received positive performance reviews throughout her tenure as Lead APW 11.

On September 26, 2013, Russell received notice that effective October 14, 2013, her appointment as Lead Worker would expire and the limited-term position would be abolished. She was informed that she would be assigned permanently to her previous APW 10 position. Her reassignment corresponded to a pay decrease of $1.35 per hour. Russell testified that she nevertheless continued to perform nearly all the duties of a Lead APW 11. The exception was employee training. She was not compensated for the work she performed out of class.

In early 2015, Russell began inquiring about the possibility of returning to her position as Lead APW 11. After apparently learning of a vacancy in November of that year, Russell expressed interest in interviewing for the position. Defendant Renee Adorjan, the county director responsible for filling vacancies, informed Russell that in order to be considered for the position, she must apply through their internal platform ("NeoGov") when the position is posted. Adorjan also advised Russell that although previous experience as a Lead APW 11 was helpful, it did not guarantee a

candidate's hiring into the same position.  On November 16, 2015, Russell received notice that the application for a Lead APW 11 position had been posted to NeoGov, and that the posting would close on November 23, 2015.  Russell immediately submitted her application, which included her transcripts, resume, and a cover letter.  The application also asked for descriptions of a candidate's prior work history and experience as an APW.

Russell was invited to interview for the position on December 4, 2015.  The human resources representative indicated to Russell that the interview would take place on December 11, 2015, and that Russell would receive a follow-up email with details in the next several days.  Russell received an email roughly 24 hours before her interview describing the interview's format and instructing her to bring three supervisory references.  The email noted that the interview would include a written exam, and that Russell would have time to review the situation-based questions before the oral component.  It explained that candidates would be evaluated based on five competencies: managing work, communication, adaptability, contributing to team success, and building customer loyalty.

Similar to her previous experience interviewing for Lead APW 11 in 2011, Russell's interview consisted of a three-person panel of supervisors and managers.  One was defendant Ryan Clemons, a White male, who was Russell's supervisor at the time and previously had given Russell positive performance reviews.  He also was familiar with a few of the other candidates interviewed that day.  Another, defendant Candace Baker, an African-American female, was a family independence manager who had previously interacted with Russell.  She testified that before the interview she had reservations about Russell's interpersonal skills.  The third interviewer, defendant Susan Cook, a white female, was the acting programs manager at the DHHS and interacted with a few of the candidates, including Russell, before the interview.

In addition to Russell, the panel interviewed four other candidates for the position:

1. Dolores Orozco, 41 year-old Hispanic female;
2. Robert Valdez, 53 year-old Hispanic male;
3. Mark McBride, 41 year-old white male; and
4. Lawrence Burr, 54 year-old white male.

Russell was 54 years old at the time of the interview.

The interview format matched the description Russell was given in the email from the day before. Russell testified that after she completed the written examination, she was allowed approximately ten minutes to review the questions to be covered during the oral component of her interview. The questions corresponded to the five competency areas on which the candidates would be evaluated:

1. <u>Managing Work</u> A case worker (who is your friend) brings you a case for assistance, and after researching the case you suspect fraudulent activity. How do you proceed with this discovery?
2. <u>Communication</u> Give us an example of a situation where you had a negative interaction with a coworker/manager. How was it resolved?
3. <u>Adaptability</u> Describe a time when you were assigned a rush project even though you had other important priorities at that time. How did you feel and what was your response?
4. <u>Contributing to Team Success</u> Tell us about how you have helped a peer, who[m] you do not know very well, to become more successful as a result of your assistance or coaching. What process did you use to assist them [sic]?
5. <u>Building Customer Loyalty</u> Tell me about a time when your patience and diligence with a co-worker helped them [sic] achieve a positive outcome.

The question sheet also included five closing questions:

1. Are you able to perform the essential duties of the position, either with or without a reasonable accommodation?
2. If you [sic] were to make a job offer would you accept?
3. Why should you be considered for this position?
4. Why do you think you would do well at this job?
5. Do you have any questions for us?

The panel's evaluation of each candidate was documented separately on "behavioral based assessment" sheets, which asked for numerical ratings for each competency on a 1-to-5 scale, and included space for descriptions of the candidates' strengths and weaknesses. The panel also was required to recommend whether the candidate was "appointable" or "not appropriate for the position." At some point after the last interview, the panel transferred the individual scoring information to a consolidated score sheet. That sheet listed the following scoring criteria, assigning numerical values to each competency:

| | |
|---|---|
| 5 | Exceptional (significantly exceeds key factors for successful job performance) |
| 4 | Very Good (exceeds key factors for successful job performance) |
| 3 | Good (meets key factors for successful job performance) |
| 2 | Average (candidate does not meet behavioral experience) |
| 1 | Poor (disqualified for hire) |

A candidate who did not receive an average score of 3 or more was ineligible for hire.

The consolidated score sheet submitted in evidence places Russell fourth among the five candidates. She received an average score of 3, while the top candidate, McBride, received an average score of 3.6. Orozco and Valdez placed in second and third, respectively, and Burr received the lowest average score of 2.6, thereby disqualifying him from hire. Russell received her highest competency score of 4 in "Managing Work," and received her lowest score of 2 in "Adaptability." McBride scored the same or higher than Russell in every competency area, receiving a score of 3 in Adaptability. The panel commented on Russell's individual assessment sheet that she possessed "good technical skill and ability," but noted "interpersonal interactions" as one of her weaknesses. As for McBride, the panel believed he was "well spoken" and "does his job well," but expressed concern "about his interpersonal skills as we see little interaction with coworkers." The candidates' actual responses to each question were not recorded.

Despite her scores, Russell later described her interview as "excellent." She believed she communicated clearly. However, when asked how she felt during the interview, she stated that she was stressed and unprepared. Russell explained it was difficult for her to obtain three professional references on such short notice, and she learned of the covered competencies with little time to prepare. She also stated that the day before her interview, she received word of a family tragedy that "threw [her] off track." As a result of those circumstances, Russell testified that she did not prepare examples ahead of time of how she met the different criteria.

On January 20, 2016, Russell learned that she was not selected for the Lead APW 11 position. At the time, she did not know who among the other four candidates was selected. Russell later found out that McBride had been recommended as the preferred candidate. The memo recommending McBride for hire described his interview performance, noting that his average score was 3.6 and that his highest scores were in the competency areas of Managing Work, Communication, and Contributing to Team Success. It also noted that his scores in Adaptability and Building Customer Loyalty indicated that he met the key factors for successful job performance in those areas. In addition to the summary of his interview scores, the memo recited the following assessment of McBride:

> Mr. McBride has demonstrated a great commitment to excellence in his work maintaining a specialized caseload working with the refugee population in the county. He has shown how he is able to establish and maintain partnerships as evidenced by his participation in regular meetings with the local agency providing direct services to the refugee population in the county. He has taken advantage of leadership development opportunities and is a [sic] respected by both his first line peers and managers. All references were completed and were positive.

The memo does not indicate who wrote it.

The parties dispute the factual basis for the defendants' decision to recommend and hire McBride over Russell. Russell testified that she believes her age, sex, and race were the only factors considered in the selection process. She also believes that her interview responses reflected her familiarity with the position for which she applied, and that because of her "experience, because of [her] knowledge, because of the fact that [she] worked in the position [her] scoring should have been higher." Despite admitting that she does not know how any of the other candidates' interviews went, Russell asserts that she was the most qualified candidate for the job, and the fact that McBride was selected over her can only be explained by discrimination, because he had less than five years of experience working for the State.

Moreover, she points to several years of performance reviews and contends that the scores she received are not representative of her abilities. Russell's performance reports as a limited-term Lead APW 11 cover the three of the areas of competency flagged in her interview — Managing Work, Building Customer Loyalty, and Communication — but do not address Adaptability or Contributing to Team Success. Russell received positive evaluations with respect to those three competency areas. Although not covered by her earlier Lead APW 11 performance reports, Adaptability apparently was included in Russell's performance report for the January 1 to December 31, 2016 rating period while she served as an APW 10.

The defendants attest that Russell's scores were based solely on her responses to the competency questions. Clemons testified that the interview panel was provided descriptions of "key actions" they were looking for, and that criteria always was read to the applicant "in hopes of receiving a more intact answer." He explained that the panel is required to score individuals based on information presented in the interview itself only. When asked why Russell received a score of

2 in Adaptability, Clemons testified that he did not have any recollection of scoring her, but stated that it would have been based solely upon her response to the Adaptability question. He stated that there was nothing in his previous experience as her supervisor that would have predisposed him to believe that Russell was not adaptive. He also explained that any discussion of Russell's perceived weaknesses would have been based on her responses during the interview.

Clemons acknowledged that he previously had given Russell favorable performance reviews and considered her "a great employee." He stated that based on his prior interactions with Russell, he recalled feeling "kind of let down by the responses I had received because I had hoped that it would be better. . . . I knew she was capable of much more." He recalled that Russell's responses lacked specificity and did not indicate how, where, or the quality with which she would perform her duties. Clemons stated that he did not share any additional information with the panel except his proposed scores for Russell.

Baker's testimony largely corroborates Clemons's understanding of what happened. She did not recall why Russell received a low score for Adaptability, and explained she would have to see how Russell answered that question to understand why she received a low score. Although Baker admitted that before the interview she had reservations about Russell's interpersonal skills, she testified that she did not express her concerns about Russell to the other panelists. She said that she was unaware of Russell's performance reviews and age at the time of the interview. When asked whom she would have selected for the position, Baker testified that Orozco was her top choice.

Cook testified that she had interacted with Russell previously and believed Russell to be a good worker, but remembered Russell had "personality issues with certain people" and "was not the

most approachable person." When asked how the scores were assigned to the candidates, Cook also testified that the scores were based entirely on how the candidates interviewed.

Adorjan testified that she had final authority over which candidate was selected. Adorjan apparently drafted the preferred candidate memo recommending McBride for hire, and she said that she did not rely on any independent knowledge of Russell or any candidates' performance reviews in making her decision. She also did not consider seniority as a factor, but she kept in mind how the position would require "working closely with coworkers in more of a teaching capacity than a production of work capacity." She recalled that she reviewed the consolidated interview score sheet, the individual assessment sheets, and the reference check sheets. She stated that prior work record was considered as part of the references check, but it was "not specifically something that is included in the interview process other than the person is usually speaking — answering the questions giving prior experience with regard to that." Adorjan explained that the competencies that are part of the interview process are also part of the employee's annual evaluation at that classification, and that the scores assigned to each candidate were arrived at by consensus.

Russell filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) on April 4, 2016. She told the EEOC that she applied for a position for which she was the most qualified and second highest in seniority among the five candidates. She alleged that a less qualified, younger, Caucasian male was selected over her, and that she was denied a promotion because of her age, race, and sex. She included a narrative of her work history with her complaint in which she believed she documented all discriminatory actions taken against her, including working out of class without compensation.

After she received her right-to-sue letter, Russell filed a three-count complaint in this Court against the DHHS alleging sex and race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Counts 1 and 2), and age discrimination in violation of the Age Discrimination in Employment Act (ADEA) (Count 3). On December 8, 2016, the plaintiff amended her complaint to substitute the individual defendants in their official capacity for the DHHS in Count 3.

## II.

The defendants all have moved for summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

A.

The defendants begin by arguing that they are immune from suit under the ADEA, because the agency (which is not named in the amended complaint's ADEA count) is immune from suit under the Eleventh Amendment, since Congress did not abrogate sovereign immunity in the ADEA. The individual defendants argue that there is no concept of individual liability under the ADEA.

That argument is a non-starter. Although (subject to three exceptions, noted below) the Eleventh Amendment bars suits in federal court "in which [a] State or one of its agencies or departments is named as the defendant," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), it "does not preclude a suit against [state official defendants named in their official capacities] for prospective injunctive relief," *McCormick v. Miami University*, 693 F.3d 654, 662 (6th Cir. 2012) (citing *McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000) ("The district court correctly determined that the Eleventh Amendment permits prospective injunctive relief, but not damage awards, for suits against individuals in their official capacities under 42 U.S.C. § 1983.")); *see also Ex parte Young*, 209 U.S. 123, 159 (1908).

There are three exceptions to Eleventh Amendment immunity: (1) when the state has waived its immunity by consenting to the lawsuit; (2) when Congress has abrogated the state's sovereign immunity; and (3) when the plaintiff seeks only prospective injunctive relief against a state official from violating federal law. *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) (citing cases). The amended complaint expressly indicates that the ADEA count is leveled against the individual defendants only and that the plaintiff exclusively seeks prospective relief against them. Sovereign immunity is not applicable under these circumstances.

### B.

The defendants next argue that the plaintiff has not exhausted her administrative remedies on all her claims, focusing on the discrete action of not paying her for working out of class, which the plaintiff attributes to a discriminatory motive.

Exhaustion is a condition precedent to filing suit, not a limitation on a federal court's jurisdiction over Title VII and ADEA claims. *Adamov v. U.S. Bank Nat. Ass'n*, 726 F.3d 851, 856

(6th Cir. 2013) (Title VII) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 401-02 (6th Cir. 2008) (ADEA). There is a clear requirement that claimants explicitly set forth the claim in the EEOC charge, but it is sufficient if the claim could "reasonably be expected to grow out of the EEOC charge." *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir. 2000) (internal quotation marks omitted).

Congress intended that the exhaustion requirement would "trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (citation omitted). But the requirement "is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quoting *EEOC v. McCall Printing Co.*, 633 F.2d 1232, 1235 (6th Cir. 1980)).

Russell's EEOC filing focuses mainly on her failure-to-promote discrimination charge. That is not the exclusive focus, however; the plaintiff's work history narrative attached to the EEOC charging document makes reference to the plaintiff "working out of class." And she makes a similar reference in the amended complaint filed in this Court.

Her EEOC filing was sufficient to satisfy its intended purpose. Although there is not much behind the claim itself, it does not fail for want of exhaustion.

## C.

Finally, the defendants argue that the plaintiff's claims fail as a matter of law because she has failed to show any pretext for discrimination. The defendants concede that the plaintiff has

established the *prima facie* case for discrimination, but they say that the evidence undisputably shows that the reason she was not promoted was because she did not perform the best among the candidates interviewed. That reason holds up, they say, because the plaintiff has offered no evidence that it was a pretext for discrimination.

1.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e–2(a)(1). To prove race or sex discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against her and that race or sex was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). These elements may be established by direct or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

In the absence of direct evidence, Title VII claims are subject to the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). If the plaintiff does so, "[t]he defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action." *Ibid.* If the defendant offers a legitimate motive, then "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Ibid.* The plaintiff may

establish pretext by showing that the employer's stated reason either (1) has no basis in fact, (2) was not the actual reason for the action, or (3) is insufficient to explain the employer's action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

Similarly, the Age Discrimination in Employment Act "forbids an employer 'to discharge . . . or otherwise discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (quoting 29 U.S.C. § 623(a)(1)).

To prove unlawful disparate treatment under the ADEA, the plaintiff must offer evidence that the employer's adverse action would not have been taken against her but for her age. *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). "[I]t is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross*, 557 U.S. at 169). As noted, these elements may be established by direct or circumstantial evidence. *Johnson*, 319 F.3d at 864-65; *see also Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009).

Although the causation element in ADEA claims requires more specific proof than an analogous claim brought under Title VII, the Sixth Circuit has held that the application of the *McDonnell Douglas* framework to determine whether the plaintiff has offered sufficient circumstantial proof of illegal motive at the summary judgment stage remains unaffected by *Gross*. *Geiger*, 579 F.3d at 622.

The parties do not dispute that the plaintiff has established a *prima facie* case of discrimination under either statute, or that the defendants' have stated a legitimate, non-discriminatory reason for their employment decision. Instead, the plaintiff argues that there is a genuine dispute of material fact as to whether the defendants' reason is pretext for discrimination. The plaintiff may establish pretext by showing that the employer's stated reason either (1) has no basis in fact, (2) was not the actual reason for the action, or (3) is insufficient to explain the employer's action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

The defendants explain that Russell was not selected for the position because she scored fourth out of five candidates on her interview. The plaintiff contends that the interview scores are not worthy of credence — and therefore have no basis in fact — because they lack an objective basis and did not accurately reflect Russell's work experience and abilities. Russell believes the defendants improperly relied on a subjective assessment of the candidates that allowed the interview panel to disguise their discriminatory views. But the plaintiff has not offered a shred of evidence that any of the defendants harbored any "discriminatory views," that the interview scoring process was flawed, or that the defendants did not rely on those scores in good faith when making their promotion decision.

The main thrust of the plaintiff's argument is that the interview scores lack a basis in fact because they were not based on objective criteria. The plaintiff argues that the interview panel did not rely on any instructions as to what factors should be considered in awarding a score on the 1-to-5 scale, and that the lack of measurable indicators presented an opportunity for the panel to score the candidates based on discriminatory beliefs. Citing *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), the plaintiff argues that subjective assessments like the interview process

employed by the defendants must be subject to "particularly close scrutiny" at this stage. However, a closer reading of *Thurman* reveals that such careful scrutiny is required in those cases where a subjective assessment was made by decision makers who were not members of a minority group or by defendants with a history of discriminatory practices. *See ibid.* (citing *Bruhwiler v. University of Tennessee*, 859 F.2d 419, 421 (6th Cir. 1988) and *Chang v. Univ. of Rhode Island*, 606 F. Supp. 1161, 1183-84 (D.R.I. 1985)). Neither of those circumstances are evident here, as the panel was comprised of one African-American and two females, and there is no indication that the defendants had a history of discriminatory behavior.

The plaintiff also cites in passing *Senter v. General Motors Corp.*, 532 F.2d 511, 529-30 (6th Cir. 1976), but reliance on that case similarly is misplaced. There, the Sixth Circuit concluded that the defendant's promotional procedures placed too great an emphasis on subjective evaluations as evidenced by the "gross disparity between the number of blacks and whites in supervisory positions, and the equally gross disparity between the percentages of blacks employed at the hourly and supervisory levels." *Ibid.* The court identified several factors that made "the promotional system a 'ready mechanism' for covert discrimination against minority employees," including the assignment of significant weight to the foreman's expressed opinion of an employee, as well as the absence of "objective criteria for evaluating potential supervisors" and "an established means of notifying hourly employees of openings in supervision and the desired qualifications." *Id.* at 529 (quoting *Rowe v. General Motors Corp.*, 457 F.2d 348, 358-359 (5th Cir. 1972)). The plaintiff has not offered any evidence of such "endemic" weaknesses in the defendants' promotional system, arguing only that the interview panel is granted considerable discretion in scoring the candidates' responses.

Contrary to the plaintiff's position, employers are not precluded from relying on subjective assessments in making an employment decision. "An employer may rely on subjective reasons to select one candidate over another . . . 'such as a subjective assessment of the candidate's performance in an interview.'" *Martinez v. Tex. Workforce Comm'n-Civil Rights Div.*, 775 F.3d 685, 688 (5th Cir. 2014) (quoting *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007)). "[T]he use of [a] subjective assessment does not serve as evidence of pretext" where the employer "provide[s] some evidence demonstrating how it scored the applicants in the interview process." *Id.* at 688; *see also Delgado v. U.S. Dep't of Transp.*, 709 F. Supp. 2d 1360, 1367 (S.D. Fla. 2010) (noting that an interview that "tested the applicant's knowledge of information relevant to the position and consisted of scripted questions and model answers" was "arguably *more* objective than the other elements of the application process.").

Here, the defendants' reliance on a subjective assessment in itself is not evidence of pretext. The prevailing rule in this Circuit is that if an employer has an "honest belief" in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (stating that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for [its action], the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect"). Under this "honest-belief rule," the "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). The defendants argue that they conducted their selection process in accordance

with established procedures, a process the plaintiff previously experienced when she was hired as a Lead APW 11 for a limited term. It appears that the only aspect of the process the plaintiff takes issue with is the defendants' sole reliance on interview responses as the basis for scoring the candidates and whether the defendants actually relied on outside knowledge of the candidates to inform their scores.

However, to defeat a summary judgment motion in such circumstances, the "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (internal citations, quotation marks, and brackets omitted) (alteration in original).

The defendants have provided sufficient evidence demonstrating how they scored the candidates in the interview process. The three defendants on the interview panel testified that the scores were based entirely on the candidates' responses to the questions posed. Clemons testified that the interview panel always is provided a description of "key actions" they should look for and accordingly score the candidates on the 1-to-5 scale based on their responses. He explained that Russell did not answer the questions with specificity, and that he was disappointed by her performance because he knew she was "capable of much more." Adorjan testified that prior experience only would have been considered to the extent that the candidates used examples to substantiate their answers. The plaintiff has not produced any evidence that reasonably suggests the defendants deviated from their stated procedure, and instead relies heavily on the fact that the defendants cannot remember the plaintiff's answers almost two years after her interview.

Russell insists that she was the most qualified candidate for the position. But a plaintiff cannot survive summary judgment where the only evidence of pretext offered is her perceived superior qualifications for the role. In *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 617 (6th Cir. 2003), the selected candidate, an African-American male, achieved an overall higher score than the plaintiff, a white male, on the interviews, which the plaintiff argued was a pretextual reason because "he was objectively the better candidate" based on his years of experience and score on a prior examination. Unlike in this case, "Education/Experience" was a scored category in the interviews, but the court nevertheless found that the plaintiff had not offered sufficient evidence to refute the defendants' position that the selected candidate's scores reflected his more extensive education background and that length of experience was not determinative. *Ibid.* The court also noted that the candidate with the highest overall score was a Caucasian female, who also received the highest score for a different position, which she ultimately accepted. *Id.* at 619. The court concluded that the evidence offered by the plaintiff amounted to nothing more than "unsupported speculation":

His argument that the Treasury Defendants' decision was based on the employees' race appears to be grounded not in evidence, but in the outcome itself: the simple fact that he did not receive a promotion to which he felt entitled. This is not sufficient to raise a genuine issue of material fact with respect to the legitimate, non-discriminatory reason offered by the Treasury Defendants to explain their employment decision.

*Id.* at 620. *See also Briggs v. Potter*, 463 F.3d 507, 516 (6th Cir. 2006) ("Briggs's 'subjective view of his qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination.'") (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)); *Johnson v. U.S. Dep't of Health and Human Services*, 30 F.3d 45, 48-49 (6th Cir. 1994) ("Plaintiff has failed to submit any evidence besides her own subjective testimony that she was more

qualified for the job than the selectee."); *Plumb v. Potter*, 212 F. App'x 472, 480 (6th Cir. 2007) ("[T]he qualifications of Plumb and Esparza were comparable, and Jarvi chose Esparza based on her better interview and her superior performance during the temporary detail. Plumb's subjective belief that he was more qualified than Esparza is insufficient to demonstrate pretext.") (citation and footnote omitted).

The same reasoning applies here. Russell insists that the interview scores are not worthy of credence because they do not reflect her years of experience and positive performance reviews. She has not offered the actual answers of the five candidates to the interview questions (no one seems to have those). But even if that evidence were available, it is not the function of the Court to second-guess the employer's evaluation of candidates. It is, of course, to search for evidence of an illegal motive. But the plaintiff has offered no such evidence.

The plaintiff asserts that Clemons and Cook described her as a "really good worker" and has submitted four years of "positive" performance management reports. However, none of those reports directly refutes the scores she was given during the interview. The plaintiff takes greatest issue with her score of 2 for Adaptability, but the only performance report that covers Adaptability does not note any description of the plaintiff's performance in that area, only indicating that she "meets expectations." That rating arguably corresponds with a score of 3 on the interview score sheet ("meets key factors for successful job performance"), which is not that dramatic of a departure from the score she received, considering the scores were based on her responses and that she admittedly was stressed during the interview. *See Mitchell v. Peralta Cmty. Coll. Dist.*, 766 F. Supp. 834, 838 (N.D. Cal. 1991) ("The deviation between [the plaintiff's] performance as Administrator

and her scores in the selection process is not inherently implausible, given that the scoring was based on applicants' responses to ten prepared questions and not on job performance.").

Additionally, the plaintiff testified that she did not know how the other candidates' interviews went or essentially anything about their respective backgrounds, including that McBride had earned a master's degree. Russell's only negative criticism of McBride is that he has fewer years of experience compared to her and never worked previously as a Lead APW 11. And she has no explanation for why the two Hispanic candidates (one female and the other approximately the same age as Russell) received higher scores than she. Russell has not produced any evidence that the three candidates who received higher scores were objectively less qualified than she for the position. She has not demonstrated that the defendants did not honestly believe that the interview scores favored another candidate over her.

2.

Russell also contends that the defendants' refusal to pay her for working out of class was motivated by illegal discrimination. She has not developed that argument very well, and the amended complaint does not plausibly state a claim for denial of equal pay based on the plaintiff's race, age, or sex. There is no reference to other similarly situated workers receiving better pay — only that the plaintiff was performing most (but not all) of the duties of a Lead APW 11 at the pay-grade of an APW 10.

The plaintiff has made little attempt to establish a *prima facie* case of discrimination based on pay, making no allegations or offering evidence that similarly situated workers received better pay for performance of the same duties. There is no evidence in the record that she was not paid for "working out of class" based on her race, age, or sex.

### III.

The plaintiff has not offered evidence that establishes a material fact issue requiring a trial on her claims of discrimination. The defendants are entitled to a judgment in their favor as a matter of law.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #26] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 6, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 6, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI